(Nos. 7097 and 7098, Consolidated

VIOLET NASS, Administratrix of the Estate of CAROLYN JEAN JONES, Claimant, *v.* STATE OF ILLINOIS, Respondent.

GERALDINE SULLIVAN, Adminstratrix of the Estate of JUDITH LYNN ATOR, Claimant, *v.* STATE OF ILLINOIS, Respondent.

*Opinion filed February 13, 1979.*

EDWARD ZUKOSKY, Attorney for Claimants.

WILLIAM J. SCOTT, Attorney General; WILLIAM E. WEBBER, Assistant Attorney General, for Respondent.

**POLOS, C.J.**

These consolidated claims arise from an automobile accident which caused the deaths of Carolyn Jean Jones and Judith Lynn Ator on April 8, 1972. Both women drowned when an automobile in which they were riding left a highway and came to rest in a water filled pit.

Claimants raise two theories on which they seek to recover. They contend that the State was negligent in having failed to erect guardrails at the point where the car left the highway, and that an Illinois State Highway Patrolman, who arrived at the scene shortly after the car left the highway, was negligent in failing to rescue the girls.

Testimony establishes that on April 8, 1972, at approximately 9:45 a.m., Carolyn Jean Jones was driving a 1967 Mustang in a southerly direction on the U.S. Route 51 by-pass around Minonk, Illinois. Judith Lynn Ator was a passenger in the car. Both girls were 19 years of age. Approximately one-fourth of a mile south of First Street in Minonk, the highway curves. The automobile driven by Carolyn Jean Jones failed to negotiate the curve, and left the highway. The car traveled diagonally a distance of approxiamtely 70 feet to a ditch, crossed the ditch, and traveled another 145 feet to the water-filled pit. The car came to rest with its front end approximately 20 feet from the north bank of the pit, and 15 feet from the west bank.

Route 51 at the accident scene is a 24 foot wide highway with a ten foot wide shoulder that slopes away from the highway for drainage purposes. Adja-

cent to the shoulder is a ditch approximately five feet deep. A witness measured the closest lateral distance from the high water mark of the pond to the edge of the pavement and found it to be 54 feet, six inches. The girls left the highway considerably north of the pond, and traveled diagonally southwest over open terrain for approximately 215 feet before reaching the water.

Highway 51 at the accident scene is within the jurisdiction of the State of Illinois, and under the control of the Illinois Department of Transportation. The by-pass around Minonk was constructed by the State in 1964. The water filled pit in which the deceased's car came to rest, known as a "borrow pit" was dug during construction of the highway. A borrow pit is an excavation made by a contractor during the course of construction to obtain additional material for building embankments.

Robert Blasius, an engineer employed by the Illinois Department of Transportation, testified as an adverse witness that during the course of construction of the highway, the State would have to approve the location of borrow pits dug by contractors. He also said that it would be better practice not to have a borrow pit adjoining the curve of a highway, as there was a danger of vehicles running off the highway at a curve.

Claimants introduced into evidence a portion of the design manual of the Illinois Department of Transportation in effect when the highway was built. The manual provides, in pertinent part:

"Guardrail is used at locations where vehicles accidentally leaving the highway would be subject to considerable danger. Generally, such points are roadways on embankments, highways with narrow medians, and roadside obstacles and hazardous structures ***."

Evidence was introduced that on September 14, 1970, another automobile left Route 51 and went into

the borrow pit. On the date of the accident, the speed limit at the accident scene was 65 miles per hour, and there were no guardrails along the curve.

There were several witnesses to the accident. Michael J. Kinney, a passenger in a northbound Chevrolet van, testified that he was in the back of the van when he observed the deceased's car leave the road at approximately 45 to 50 miles per hour. He said the car did not flip over, but struck a number of obstacles between the time it left the highway and landed in the pond. He said the car went up into the air after it hit the embankment adjoining the shoulder, and bounced several times before landing in the pond.

Kinney and the driver of the van, one Anthony DeRosa, swam out to the car in an effort to rescue the girls. When they reached the car it had not yet totally submerged and the girls were visible through the window. At least one of the girls was calling for help. DeRosa said he tried to open the door on the passenger side but could not do so because of the water pressure against it. At this point, DeRosa began to have breathing problems in the cold water. A tire was floating in the water and Kinney used the tire to pull DeRosa to shore.

When the two men got back to shore and wrapped themselves in blankets, State Trooper Robert Martin arrived on the scene. DeRosa said that when Martin arrived, part of the Mustang was still visible, ten to 15 feet from the north bank of the pond.

Martin rolled up his pants legs, and waded about five feet into the water. At this point he was approximately ten feet from the Mustang. Martin returned to the shore and made no further attempts to reach the car.

Daryl Nelson arrived at the borrow pit before the Mustang sank and shortly after Martin arrived. Nelson said that Martin ordered everyone to stay out of the water.

Martin, who had been a State Policeman since 1968, was an experienced swimmer. He said that he had never received any instruction from the Illinois State Police on rescuing persons from submerged automobiles. Martin said that he was forced to leave the water because it was too cold, and that he made no further rescue efforts after he had left the water. He said that he had no knowledge whatsoever as to how to rescue persons in submerged automobiles. He said he thought that the girls in the car were dead when he arrived, and had no knowledge of how long they could have survived in an air pocket in the car.

Sometime later a wrecker arrived. A boat was sent for and when it arrived another rescue was attempted, but was aborted because of the cold.

At about 12:20 p.m., a scuba diver arrived with proper diving gear and attached two truck cables from the wrecker to the frame of the car so it could be pulled out of the pit. At this point, the car had slid an additional ten feet into the water, but was resting in no more than 12 to 13 feet of water. When the car had first submerged, it was in approximately seven feet of water.

The doors of the car opened easily after it was recovered from the borrow pit.

John L. Donovan, an expert witness, testified that he had made several escapes from submerged automobile and that car doors on a submerged car can be opened easily once they are completely covered with

water and water pressure equalizes on the inside and outside of the door. He said that in a submerged car an air pocket typically forms near the back window of the automobile, which can sustain life for as much as 30 minutes.

Without objection, Donovan testified that in his opinion, the maximum survival time in the Mustang was from 20 to 30 minutes. He further stated that in his opinion, if somebody had opened the door of the car during that period of time, the girls would have been rescued.

Wayne Kasza was employed by the Illinois Department of Transportation as a design projects engineer. He was responsible for designing and implementing design aspects of new or reconstructed highway projects. He said that the Route 51 south of Minonk was constructed in March, 1964, and completed in August, 1965. He said there were general design specifications then in effect with respect to highways, which contained criteria for erection of guardrails. He said that when the highway was constructed the principal criteria for construction of guardrails was the height and fill of the embankment, combined with the degree of curve of the highway. He said that the road at the accident scene had a two degree horizontal curve and that the pavement sloped to the embankment of a ratio of approximately four to one. He said that according to the applicable design criteria when the highway was built guardrails were not required at the curve. He said that sometime in 1966 the criteria for placement of guardrails was changed, applicable to new construction. The new criteria established some additional factors to be used in determining whether guardrails were needed including the width of the shoulder of the road, and the condition of the shoulder and road.

He said that even under these new criteria, guardrails at this particular curve were not required. He further said that in 1967 and 1968 additional changes were made which generally incorporated certain safety criteria established by the Federal Government. These criteria were applicable to all new construction. He said that the current policy on the placement of guardrails would still not require that they be posted at the accident site.

On the date of the accident, Carolyn Jean Jones was 19 years of age, and had been employed by Farm Services, in Bloomington, Illinois, since January, 1972. She earned approximately $90.00 per week. She had never been married, had no children and was survived by her parents and brothers and sisters. Her mother, Violet Nass, testified that she drove the Mustang involved in the accident a few days prior thereto, and that it had no steering problems, had four new tires, and was kept in good mechanical condition.

Judith Lynn Ator was also 19 years of age at the time of her death. She had never been married, and was survived by her mother, her brothers and a sister. She was employed by Farm Services in Bloomington, earning between $80.00 and $85.00 each week.

Geraldine Sullivan, the mother of Judith Ator, testified that she had accepted the sum of $567.50 from Carolyn Jones' insurance carrier, and executed a release at the request of the company. The document, entitled "General Release," purports to release Nass Trust Lines, Inc. and its agents, servants, and all other persons, firms, associations, and corporations of any and all actions, claims and demands arising out of the accident of April 8, 1972.

Mrs. Sullivan said that when she signed the docu-

ment entitled "General Release" she thought she was signing a receipt for the money the insurance company gave her. She said that the insurance company contacted her and that it was never explained to her that by signing the document she could be considered to have released claims against the State of Illinois. She had no legal advice before signing the document.

Claimants contend that the State was negligent in placing the borrow pit in close proximity to the high-way, and in failing to erect a guardrail at the curve. Claimants also contend that the State is liable for the failure of Trooper Martin to rescue the deceased girls.

Respondent argues that it was not negligent, and that the deaths of the girls was caused by the negligent operation of the car by Carolyn Jones. The State also argues that the "General Release" executed by Geraldine Sullivan bars this claim on behalf of Judith Ator.

The State of Illinois is not an insurer of the safety of persons who travel upon its highways. However, the State owes a duty to those persons to use reasonable care in the maintenance and erection of its roadways. One authority has described the duty of a public authority in such instances, as follows:

"It is well settled that it is the duty of the public authority to erect railings or barriers along the highway at places where they are necessary to make the way safe and convenient for travelers in the use of ordinary care, and that such public authority is liable for injuries to travelers resulting from a breach of its duty in this regard. This is true even though the danger arises from structures or excavations outside the highway and on the land of adjoining owners, when such structures or excavations are in the general direction or course of travel upon the highway. Whether a railing or barrier is necessary in a given case particular locality in reference to which the question arises. Among the material facts to be considered are the character and amount of travel, the character of the road itself, its width and general construction, the character and extent of the slope or descent of the bank, the direction of the road at the place, the length of the portion claimed to require a railing, whether the danger is concealed or occur therefrom. A number of Courts have laid down the rule that the danger must be of an

unusual character and one that exposes travelers to unusual hazards, such as bridges, declivities, excavations, steep banks, or deep water." *39 Am.Jur.2d 796.*

It appears from a preponderance of the evidence, that the State was not negligent in failing to erect a guardrail at the site where the deceased's car left the highway. The borow pit was located approximately 55 feet from the edge of the pavement, measured at its closest lateral distance from the high water mark of the pit. The car in question left the highway considerably north of the pit, and traveled over open terrain for approximately 215 feet before reaching the water. Further, the State presented testimony establishing that when the highway was built the applicable design specifications did not mandate installation of guardrails.

There is no evidence that the State violated its own design criteria in failing to erect a guardrail, or in approving the location of the borrow pit in proximity to the highway.

Claimants also contend that the State is vicariously liable for the inaction of Trooper Martin at the accident scene. Claimants argue that Martin was negligent in failing to make more strenuous rescue attempts, and in preventing others at the scene from making rescue attempts.

However, we are unable to find that Trooper Martin violated any duty to the deceased victims of the accident. It is ancient law that there is no legal duty to rescue one in peril. See, *Prosser on Torts,* 4th ed., p. 340; *County of Peoria v. Industrial Commission, 3 Ill.2d 562, 202 N.E.2d 50.* Nor do we find such a duty in Ill. Rev. Stat. Ch. 121, §307.16 which sets forth the duties of State policeman:

"§307.16 Powers and duties — Enforcement of Motor Vehicles Laws

State policemen shall enforce the provisions of The Illinois Vehicle Code, approved September 29, 1969, as now or hereafter amended, and Article 9 of the "Illinois Highway Code" as now or hereafter amended; and "An Act to define, regulate and license the business of itinerant merchant by motor vehicle; and to provide for the administration and enforcement thereof," filed July 22, 1941, as now or hereafter amended; and shall patrol the public highways and rural districts to make arrests for violations of the provisions of such Acts. They are conservators of the peace and as such have all powers possessed by policemen in cities, and sheriffs, except that they may exercise such powers anywhere in this State. The State policemen shall cooperate with the police of cities, villages and incorporated towns, and with the police officers of any country, in enforcing the laws of the State and in making arrests and recovering property. They may be equipped with standardized and tested devises for weighing motor vehicles and may stop and weigh, acting reasonably, or cause to be weighed, any motor vehicle which appears to weigh in excess of the weight permitted by law. It shall also be the duty of the State police to determine, whenever possible, the person or persons or the causes responsible for the breaking or destruction of any improved hard-surfaced roadway; to arrest all persons criminally responsible for such breaking or destruction and bring them before the proper officer for trial.***"

Whatever the Court may think of Trooper Martin's actions at the accident scene, he was exercising his discretion as to the best manner in which to handle the situation. Martin testified that he thought the girls were already dead when he arrived at the scene, and that he had to abandon rescue attempts because of temperature of the water. We have found no authority to support the view that a law officer owes a duty to endanger his own life and safety to rescue a member of the public. We, therefore, cannot hold the State liable on a theory that Martin should have endangered his own safety, or that of others at the scene.

We also note that prior to Martin's arrival, an unsuccessful rescue attempt was made by Kinney and DeRosa. After he arrived another rescue attempt was made with a wrecker and a boat, which was also aborted because of the low water temperature.

This was a tragic loss of life, and the Court has accordingly scrutinized the record with particular care.

The Court has also fully considered the vigorous and imaginative arguments raised by Claimants' able counsel. We must reluctantly conclude however, that the State cannot be held liable for the deaths of Caroline Jones and Judith Ator.

These claims are accordingly denied.