(No. 86-CC-3287

ANN FEJES, Executrix of the Estate of Joseph M. Fejes, Deceased, Claimant, *v.* THE STATE OF ILLINOIS, Respondent.

*Order filed February 2, 1990.*

*Opinion filed May 13, 1994.*

ZIMMERLY, GADAU, SELIN & OTTO (JOHN OTTO, of counsel), for Claimant.

ROLAND W. BURRIS, Attorney General (KAREN McNAUGHT, Assistant Attorney General, of counsel), for Respondent.

OPINION

MITCHELL, J.

The claim for damages in excess of $100,000 was brought by Claimant, Ann Fejes, executrix of the estate of Joseph M. Fejes, alleging that Respondent was negligent in causing the death of Joseph Fejes. The claim arises out of an accident involving a single motor vehicle driven by Mr. Fejes striking a bridge abutment on U.S. Route 45,

approximately three-tenths of a mile south of Champaign County Road 2300N on June 27, 1984.

In the complaint, Claimant states that "Respondent owed Plaintiff a duty to exercise reasonable care in maintaining, repairing and improvement of highways within the State." (Complaint, par. 3.) Claimant alleges that Respondent breached its duty by committing one or more of the following negligent acts or omissions:

1. Negligently failed to place a guard rail around a certain bridge abutment on U.S. Route 45 in Champaign County, Illinois between the municipalities of Urbana and Rantoul.

2. Failed to provide or post adequate warning of the presence of said unguarded bridge abutment to the users of said highway at the above place.

The complaint includes a bill of particulars in paragraph 13, detailing damages as $193,440 for loss of income, $150,000 for loss in value of business and $4,289.90 for funeral expenses, for a total of $347,729.90.

A hearing was conducted on December 23, 1991. After the close of Claimant's case in chief, Respondent moved for a directed verdict which was taken under advisement and Respondent proceeded with its defense without waiving its motion.

### Claimant's Case In Chief

In the presentation of her case in chief, Claimant called four witnesses: Douglas A. Reifsteck, an occurrence witness; Terry A. Klutts, the State trooper responsible for investigating the accident; Jongin Cragg, a former real estate broker; and Matt Fejes, the son of decedent. Ann Fejes testified as a rebuttal witness. The testimony of Charles D. Sanders, Respondent's witness, is used by Claimant in her brief to support her case.

Claimant presented 27 exhibits of which 25 were offered into and admitted into the record. Claimant's exhibits nos. 1 through 23 are photographs depicting various views of the northbound and southbound lanes of U.S. Route 45 at or near the subject bridge abutment. Claimant's Exhibit No. 24 is the Illinois State Police Traffic Accident Report No. 6877834. Claimant's Exhibit No. 25 is an October 4, 1984 letter signed by Cragg confirming that Matt Fejes and Joe Fejes received and turned down an offer of $750,000 to purchase the building and business of the Town & Country Steak House. Claimant's exhibits nos. 26 and 27 were used to refresh the recollection of Matt Fejes, but were not offered into or made a part of this record. Exhibits nos. 26 and 27 are attached to the transcript.

Claimant presented a certified copy of the Life Tables, dated 1978 and published by the U.S. Department of Health and Human Services. The parties stipulated that the 1978 table indicated a life expectancy of an average white male of the age of Mr. Fejes at his death was 11.6 years. The Commissioner took judicial notice of the stipulation and information, and the tables were not made part of the record.

The unrebutted testimony presented in Claimant's case in chief is as follows:

Mr. Fejes was traveling to Rantoul by himself on June 27, 1984, in his daughter's car, a 1967 Volvo. Mr. Fejes had trouble shifting the car because it was a stick shift and he had never driven it on the highway.

Douglas A. Reifsteck, a farmer from Tolono, witnessed the accident on U.S. Route 45 that resulted in the death of Mr. Fejes at about 10:50 a.m. on June 27, 1984. Mr. Reifsteck was hauling grain with a tractor-trailer from

an elevator in Thomasboro, a small town between Urbana and Rantoul. Mr. Reifsteck first observed Mr. Fejes turning around in Thomasboro and heading south, the direction Mr. Reifsteck was traveling. U.S. Route 45, where the accident occurred, is a four-lane divided highway, two lanes being for southbound traffic.

As Mr. Reifsteck picked up speed going south out of Thomasboro, Mr. Fejes passed him, going about 45 to 50 miles an hour. Mr. Fejes passed Mr. Reifsteck about half a mile before the accident occurred. Mr. Reifsteck watched as the car Mr. Fejes was driving veered into the passing lane, and then moved off to the right and hit a concrete bridge abutment, all in about two seconds time. Mr. Reifsteck stopped his truck, put on his four-way flashing lights and called for police and ambulance on his citizens band radio. The abutment hit by Mr. Fejes is identified as survey station 2573 on U.S. Route 45 between Thomasboro and Urbana.

On cross-examination, Mr. Reifsteck stated that he did not see any brake lights and did not see the vehicle skid. He did not see any movement back to the left by the vehicle to try to get it back on the road.

State Police trooper Terry Klutts was one of the police officers who responded to the call. Trooper Klutts observed that Mr. Fejes had collided with the bridge abutment. He determined that Mr. Fejes was not breathing and had no pulse, and he administered CPR until the ambulance came. The coroner's physician determined that Mr. Fejes died within seconds of the accident.

After Mr. Fejes was taken away by ambulance, trooper Klutts took measurements and interviewed witnesses. Trooper Klutts determined that Mr. Fejes had left the road 173 feet before he hit the abutment. Klutts

determined that it would take a vehicle traveling 60 miles an hour between two and three seconds to travel 173 feet.

According to trooper Klutts' measurements, the southbound lane of the road at the bridge where Mr. Fejes was killed was 25 feet 10 inches wide, wall to wall. The pavement of the southbound lane was 22 feet wide and the bridge wall was one foot, ten inches from the edge of the pavement. On cross-examination, Klutts reviewed his report and stated that the roadway at the bridge was 25 feet 10 inches from curb to curb, therefore the bridge walls would then be a total of 29 feet 6 inches apart. The bridge abutment itself was 3 feet 10 inches high and 11 inches wide. A rain gutter, four inches deep, extends along the side of the roadway north from the bridge, about 130 feet 9 inches.

There were guardrails at three of the four approaches to the bridge, but none at the corner of the bridge abutment that Mr. Fejes hit.

There was a driveway or an entrance to a field on the west side of U.S. Route 45 and approximately 10 feet to the north of the bridge. The field had no fences, but was open, without any demarcation lines from the ditch that ran under the bridge all the way north to County Road 2300N. County Road 2300N is about three-tenths of a mile north of the accident scene.

In the beginning of 1984, while Mr. Fejes was still alive, Jongin Cragg, a real estate broker employed by Norrick and Morrow, conveyed an offer to purchase the Town & Country restaurant for $750,000 from Yen Ching, Inc. The offer to purchase was turned down because Mr. Fejes thought the business was worth more. After the death of Mr. Fejes the real estate was sold for

$600,000 on March 1, 1985, to the same people who had made the previous offer. Although Claimant asserts that both offers were for the business and real estate, Cragg testified on cross-examination that at the time of the sale the business was closed. She then stated that the closure would not affect the purchase price because the buyers were buying "real estate not business."

Matt Fejes, son of the decedent, testified that the Town & Country restaurant was owned by J.M.J. Associates, which was a partnership consisting of Mr. Fejes, Matt, and his brother-in-law, Jim Splitic. Mr. Fejes had put $290,000 into the business; Jim Splitic had put $85,000 into the business and Matt Fejes had put $8,000 into the business. He also stated that basically the three were one-third partners.

Matt Fejes stated that at the time of Mr. Fejes' death, there was a business debt of about one million dollars. In any sale, the proceeds were to be divided up with Mr. Fejes getting back his $290,000, Mr. Splitic getting back his $85,000, and Matt Fejes getting back his $8,000. If there was a reduction in sales proceeds, the biggest loser was Mr. Fejes, who had put $290,000 into the business.

Mr. Fejes took a salary of $15,000 a year out of the business, and in addition the business paid for an automobile, entertainment expenses and food for Mr. Fejes, so that the total value of the compensation he took out of the business was from $25,000 to $30,000 a year. On cross-examination, Matt Fejes stated that the salary paid to Mr. Fejes was for Mr. Fejes and his wife, the Claimant, who worked as hostess.

During the time that Mr. Fejes owned and operated the restaurant, he arranged with a State agency to provide

jobs for mentally-retarded children, doing janitorial work in the restaurant. From 15 to 20 mentally-retarded children were trained at the restaurant by the Fejes family.

On cross-examination, Matt Fejes acknowledged that Mr. Fejes had been hospitalized recently and had a lung biopsy performed. He was diagnosed with Wegner's granul omatosis, was on medication, had ulcer problems and high blood pressure.

The life expectancy for white males 69 years of age, Mr. Fejes' age, was 11.6 years pursuant to Life Tables dated 1978.

### Respondent's Motion for Directed Verdict

The Respondent moved for a directed verdict at the close of Claimant's case in chief. The Commissioner ruled that the motion would be taken under advisement and that Respondent could present its defense without waiving the motion.

The Court in *Secor v. State* (1991), 44 Ill. Ct. Cl. 215, ruled:

"When considering a motion for directed verdict, the evidence presented in claimant's case must be viewed in its aspect most favorable to the opponent of the motion. The motion should be granted when all of the evidence, viewed most favorably to claimant, totally fails to establish one or more essential elements of the cause of action. [Citations omitted.]

The claimant must prove the Respondent had a duty to claimant, breached its duty and the breach proximately caused his injury." *Secor* at 217.

In deciding a motion for directed verdict, the Court must look solely to the evidence presented by Claimant in his case in chief. *Stanley v. Board of Trustees of the University of Illinois* (1985), 39 Ill. Ct. Cl. 107.

The record shows that the Commissioner, upon an inquiry by Claimant's counsel prior to the presentation of Claimant's case in chief, stated that the departmental

report was made a part of the record and would be considered as evidence in the case. There was no objection made by Respondent to this ruling. Under the circumstances presented here, the Court will allow the evidence included in a departmental report to be utilized when deciding on a motion for directed verdict.

On the element of Respondent's duty to the Claimant, the Claimant did not present any testimony or other evidence that the Respondent is "responsible" for the maintenance, repair and improvement of U.S. Route 45 in Champaign County, as alleged in paragraph 2 of the complaint. A liberal reading of paragraphs 2 and 3 of the complaint together could be interpreted to form the basis of an allegation that Respondent owed Claimant a "duty" to exercise reasonable care in maintaining, repairing and improvement of U.S. Route 45 at or near the scene of the accident.

This liberal interpretation of the allegations is supported by Claimant's argument I in its brief, that, "The State of Illinois Was Negligent In Not Providing A Guardrail At Survey Station 2573, The Bridge Abutment Hit By Mr. Fejes."

There is no doubt Claimant presumed that Respondent was responsible for, and had a duty to exercise reasonable care in, maintaining, repairing and improvement of U.S. Route 45. None of the witnesses testified to any facts that, if proven true, would establish that Respondent had a duty, or even a responsibility, for maintaining, repairing and improvement of U.S. Route 45. No exhibit offered by the Claimant demonstrates that the Respondent had any duty or responsibility in regards to U.S. Route 45 and the respective bridge abutment. Although the evidence viewed most favorably to Claimant as presented in Claimant's case in chief fails to establish the Respondent had any duty, there is sufficient evidence in

Respondent's departmental report that indicates Respondent had a duty, or responsibility, for maintenance and repair of U.S. Route 45 and the abutment. Viewing the material included in the departmental report in its aspect most favorable to the Claimant, the Court finds that Claimant does not fail to establish the element of duty.

In relation to the second element that the Respondent breached its duty, Claimant has presented evidence of a motor vehicle striking a bridge abutment along U.S. Route 45. Claimant asserts that the abutment was approximately one foot and ten inches from the edge of the roadway pavement.

No evidence was presented to indicate that Respondent should or could place a guardrail at the abutment. Claimant did not present any evidence, nor does she cite any legal authority or acceptable safety standards, that would specify that a guardrail should be placed at the abutment.

The nexus of the first prong of Claimant's argument is that Respondent should have designed and constructed the bridge abutment, and the highway, to include a guardrail at the place of the accident. The second prong of Claimant's argument is that Respondent failed to provide adequate warning of the presence of an unguarded bridge abutment to the users of the highway.

It is clear that the basis of the first prong of Claimant's claim is not that Respondent failed to maintain or repair the bridge abutment. Claimant makes no allegation the condition of the unprotected abutment caused the injury, but instead alleges that the location of the unprotected abutment caused the injury. It is not alleged that a defect existed in the condition of the abutment that proper maintenance or repair could have corrected.

It is not clear what is meant by Claimant's allegation that Respondent breached its duty to exercise reasonable care in the "improvement" of the highway, but it is reasonable to conclude Claimant is asserting that at a point in time subsequent to the original design and construction of the abutment and highway a guardrail should have been installed. No evidence was presented in Claimant's case in chief, or in the departmental report, that would show that acceptable safety standards would have required a guardrail, or that subsequent to the original construction a guardrail would have been required. The only relevant evidence on the element of breach of duty is that: (a) the abutment on the east side of the approach to bridge has a guardrail, but the abutment on the west side of the bridge does not have a guardrail; and (b) there is a field entrance (or driveway) approximately 10 feet north of the abutment. Claimant does not cite any authority which stands for the propositions that an unprotected abutment approximately one foot ten inches from an edge of the pavement of a highway is as a matter of law a breach of a duty on the part of the entity responsible for the condition, or that it creates a *per se* hazardous condition.

Claimant's theory as to the breach of duty is essentially as follows: guardrails are attached to the bridge abutments on the east and west side of the northbound lane of U.S. Route 45. A guardrail is attached to the bridge abutment on the east side of the southbound lane of U.S. Route 45 but there is no guardrail attached to the abutment on the west side of the southbound lane. Claimant therefore maintains that the existence of guardrails at three of the four bridge abutments demonstrates that Respondent was aware of the hazard of unguarded abutments at the location. Claimant also presented evidence

of a driveway or field entrance immediately (approximately 10 feet) north of the abutment and in the location where she asserts that Respondent should place a guardrail. Claimant did not present any evidence as to ownership of the field entrance or the reasons for its existence or whether it is legally entitled to be located at that place.

The allegation that Respondent was negligent because it failed to exercise reasonable care in the "improvement" of U.S. Route 45 may be construed liberally to mean that Respondent should have constructed a guardrail as an improvement of the highway and abutment. The Court may find that the evidence, *i.e.*, an absence of a guardrail, in Claimant's case is sufficient to withstand the motion for directed verdict. The Court has previously noted that the duty of a public authority may be breached when it does not erect railing or barriers along the highway at places where they are necessary to make the way safe and convenient for travelers. Among the material facts to be considered are the character and amount of travel, the character of the road itself, its width and general construction, the character and extent of the slope or descent of the bank, the direction of the road at the place, the length of the portion claimed to require a railing and whether the danger is concealed. *Nass v. State* (1979), 32 Ill. Ct. Cl. 487, 494.

In considering the material facts as stated in *Nass*, specifically the width and character of the highway, and because the Claimant's evidence tends to show the abutment to be within two feet of the pavement, the Court finds Claimant's evidence does not fail to establish the element of breach of duty. *Nass* at 487.

The Court finds the evidence on the element of causation is sufficient to withstand the motion. The report of coroner's physician states the condition which gave rise to

immediate cause of death and it shows that the striking of the abutment was a cause.

On the element of damages, there is evidence that the decedent was earning a salary, therefore the evidence is sufficient on the element of injury or damage. Based upon the foregoing, the Court denies Respondent's motion for a directed verdict.

### Respondent's Case in Chief

The Respondent presented Charles D. Sanders, a policy development engineer in the Bureau of Design, Department of Transportation, responsible for the preparation of policies, including the use of guardrails and other safety policies on interstate highways. The Commissioner found that Mr. Sanders is an expert in policy design.

Mr. Sanders testified that an effective guardrail could not have been designed at the location of the accident. The 10 feet of space between the abutment and the field entrance is not enough room to construct a guardrail.

There was a warning sign, referred to as a "hazard marker," on the bridge to warn motorists of a hazard. Mr. Sanders opined that the Respondent made a reasonable effort to warn the decedent.

Although decedent left the pavement over 170 feet from the abutment, there was no attempt to recover. The coroner's report indicates Mr. Fejes was on medication and had been advised not to drive.

Sanders explained that the two guardrails attached to the east and west side abutments of the northbound lanes and the abutment on the east side of the southbound lane, were installed according to design standards that were in effect at the time of construction. The purpose of the guardrail was to redirect the motorist from hitting the

abutment. The field entrance, located north of the subject abutment, could not be blocked, therefore an effective guardrail could not be installed. The design standards permit the Respondent to move the field entrance if the entrance does not have to be moved onto another person's property.

Sanders stated that according to today's design standards, a couple hundred feet was necessary to put an effective guardrail at the location. At the time the abutments were originally constructed 100 feet was necessary to install an effective guardrail. The design standards do not permit a guardrail to be installed within the 10 to 15 feet between the field entrance and the abutment.

Sanders did not have any personal knowledge as to why the field entrance was not moved. The departmental report included two memoranda, one dated August 19, 1985, and the other July 18, 1986, on that question. Both memoranda indicate that a guardrail was not installed at the abutment in question because it would block access to the property north of the stream (or bridge) and there was no history of accidents at the bridge. If the entrance was not necessary, Respondent would have placed a guardrail at the location. An improperly installed guardrail, one with too short of a taper, becomes a greater hazard.

In 1982, when the bridge was last worked on, the design standards did not require the installment of a guardrail at the abutment in question.

### Rebuttal Witness—Claimant

Ann Fejes testified as a rebuttal witness. She was with Mr. Fejes the last time he saw a doctor. She did not know of any restrictions placed by any doctor in terms of Mr. Fejes' ability to drive.

## Case Law

Claimant cites several cases in her brief. The cases do not address the issue of when or where the Respondent may be negligent for the failure to construct a guardrail.

Claimant argues that it is reasonably foreseeable that a motorist would hit a bridge abutment one foot ten inches from the pavement. Claimant cites *Keller v. State* (1982), 36 Ill. Ct. Cl. 99, in support of her argument. In *Keller,* a motor vehicle left a highway and slid into a previously-damaged guardrail. The claimants in *Keller* alleged that Respondent was negligent in permitting the dangerous condition (the previously-damaged guardrail) to exist for over three months. (*Keller* at 101.) *Keller,* unlike the circumstances in the present dispute, is a case where there was evidence of a failure in Respondent's maintenance duty.

Claimant cites *Seifert v. State* (1988), 42 Ill. Ct. Cl. 8, for the propositions that it is reasonable to assume that vehicles leave the paved surface of the highway from time to time and that the Respondent has a duty to maintain the shoulder of the roadway in a reasonably safe condition. In *Seifert,* it was undisputed that the shoulder was in a general state of poor repair. (*Seifert* at 10.) The case at bar is styled, regardless of the allegations, as a case where Claimant is alleging improper design or construction, not maintenance. Claimant has not cited any case addressing the issue of when the State is liable for not designing or installing a guardrail.

In *Brockman v. State* (1975), 31 Ill. Ct. Cl. 53, Claimants alleged that Respondent was negligent in designing a highway. The *Brockman* court noted the well-settled law that the State is not an insurer of the safety of all persons who use its highways. (*Brockman* at 56.) The *Brockman*

claimants presented no testimony to indicate that the design of the highway and drains were not in conformity with accepted standards in the industry at the time they were constructed. The Court ruled that a single instance of a drain becoming clogged is not proof of negligent design. *Brockman* at 57.

The case at bar is similar to *Brockman* because Claimant did not present any testimony or exhibit that indicated that the design of the highway and the abutment were not in conformity with accepted standards in the industry at the time they were constructed. The Claimant did not present any evidence that the failure to place a guardrail at the location in question violated any accepted standards in the industry at the time of the accident.

The Court has addressed the issue of whether the State was negligent for not constructing a guardrail at other locations.

In *Nass v. State* (1979), 32 Ill. Ct. Cl. 487, the Court found that Respondent was not negligent in failing to erect a guardrail at the site where a car left the highway. In *Nass*, the testimony established that when the highway was built, a guardrail was not mandated at that location. (*Nass* at 495.) The Court, in denying the claim, stated that there was no evidence the State violated design criteria in not erecting a guardrail.

In *Vaughn v. State* (1985), 38 Ill. Ct. Cl. 27, the Court entered an award where a dip in the highway caused a vehicle to leave the road and crash into a lake. In *Vaughn*, Claimant called a State trooper as a witness and he testified that there had been other accidents at that location and he had talked to the highway department about putting up protection or a guardrail to keep people from running into the lake. *Vaughn* at 29 and 30.

The *Vaughn* case is distinguishable from the case at bar because the *Vaughn* claimant left the highway because of a condition, the dip, on the highway. In the present case, there is no apparent reason why Mr. Fejes' motor vehicle left the highway. Contrary to the facts presented here, in *Vaughn* there was evidence of prior similar incidents and the opinion of a State trooper that a guardrail should have been present.

Although no cases have been located wherein a motorist struck an abutment not protected by a guardrail, *Hodge v. State* (1981), 35 Ill. Ct. Cl. 50, involves a fact scenario where a motorist struck the concrete headwall of a culvert. The *Hodge* claimant alleged that the location and construction of the concrete culvert was negligent and introduced evidence that highway standards in existence on the date of the accident were such that concrete culverts were obsolete. The evidence showed that the culvert met the construction standards at the time of construction. The Court found that there was no evidence that the headwall should have been removed. The Court noted:

"Further, it is not unreasonable to conclude that monetary limitations would prevent the State from completely redoing every State highway at any time that the State adopts new construction standards for reconstructed or new highways. The impossibility of such a responsibility both from the standpoint of public finances and available manpower militates in favor of a rule that would not require the State to undertake massive reconstruction of existing facilities." *Hodge v. State* (1981), 35 Ill. Ct. Cl. 50, 55.

In the present case, there is no evidence that would prove the Respondent was not in compliance with accepted safety standards, either at the time the abutment and the highway were initially constructed, or on the date of the accident. Claimant argues that the Respondent has not demonstrated that the field entrance could not be relocated. Respondent does not need to demonstrate that the field entrance could not be relocated. The only relevant testimony on compliance with

safety standards was by Sanders. The Court finds that Sanders' testimony establishes that the absence of a guardrail did not violate accepted safety standards.

Furthermore, the Court finds that Respondent did not breach its duty to the decedent by failing to warn him of the nonexistence of a guardrail. The case cited by Claimant in support of her argument was in relation to the State failing to post a second speed limit sign on an exit ramp designed in an "S" configuration. (*Starcher v. State* (1988), 36 Ill. Ct. Cl. 144.) The State posted a speed limit sign for the first curve of the "S" configuration but not the second curve. The State knew from prior testing that the maximum safe speed of the second curve was significantly less than the maximum safe speed posted for the first curve. The present case is distinguishable, because the State in *Starcher* did not just fail to warn, but the warning the State gave misled the motorist to believe the posted speed was safe for the entire "S" configuration. 36 Ill. Ct. Cl. 144, 146.

Claimant did not present evidence of what type of warning should have been present, although she baldly asserts that, "the State should have erected a warning sign warning motorists of the lack of a guardrail, so that the motorist would be properly alerted to take special precautions in crossing the bridge." In the case at bar, the evidence indicated that a warning (hazard marker) sign was placed immediately north of the subject abutment. The Respondent's expert, Mr. Sanders, opined that Respondent made a reasonable effort to warn decedent. Based upon the evidence, including the clear weather conditions, it is reasonable to conclude that the abutment and the warning sign were readily visible to decedent.

For the foregoing reasons, the Court holds that the Respondent did not breach a duty to decedent because of

the absence of a guardrail and an additional warning sign. The Court further holds that Claimant failed to prove by a preponderance of the evidence that Respondent was negligent. Therefore, the claim is denied.